Filed 9/29/25  In re K.B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | |
| | D085837 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J521526ABC) |
| v. | |
| BAILEY W. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant Bailey W. (Mother).

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant Robert W. (Father).

David J. Smith, Acting County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel for Plaintiff and Respondent.

In November 2024, a violent altercation occurred between Mother and Father in the parking garage of Mother's building that continued in Mother's apartment, where their child, nine-month-old B.W., was sleeping in her crib. Investigation by the San Diego County Health and Human Services Agency (Agency) uncovered multiple incidents of domestic violence between Mother and Father dating back at least to June 2024. The Agency petitioned for jurisdiction over B.W. and Mother's two other children, four-year-old Ke.B. and two-year-old Ki.B., over whom she shared custody with ex-husband K.B. (Stepfather).

Mother and Father appeal following the dispositional hearings in the consolidated dependency cases. Mother appeals the jurisdictional findings and the disposition orders removing all three minors from her custody and awarding her supervised visits. Father appeals the jurisdictional finding over his child, B.W.

We affirm.

BACKGROUND

Mother and Stepfather married in 2019 and separated in 2022. Mother and Stepfather have two children, Ki.B. and Ke.B.[1]

Mother met Father, an active duty Marine, in July 2023. They married in October after Mother learned she was pregnant. Ki.B. and Ke.B. stayed with Mother and Father during the week and stayed with Stepfather and Stepfather's wife T.B. (Stepmother) on weekends. B.W. was born in February 2024.

According to Mother, after they married, Father began using cocaine and steroids, and he grew violent and volatile. In June 2024, Mother said

---

[1] Stepfather is the stepfather of B.W. but the biological father of Ki.B. and Ke.B. He is referred to as Stepfather to distinguish him from appellant Father.

Father strangled her while they argued.  She told Stepfather, and Stepfather reported Father for domestic violence and possession of cocaine.[2]  Naval Criminal Investigative Services (NCIS) investigated and found drugs in the marital home.  Mother alleged a domestic violence incident and a pattern of physical and mental abuse in a complaint with NCIS.  Around this time Mother separately reported to Camp Pendleton police that she received a call from Father expressing suicidal thoughts and threatening violence against Mother and B.W.  When the police tried to interview her further, Mother recanted her statements and said she lied about Father's threats.

Father was arrested and a Military Protective Order (MPO) was put in place in June 2024 prohibiting contact between Mother and Father.[3]  The Agency offered Mother and Father voluntary domestic violence and parenting services, but they did not utilize the services.

Mother and Father violated the MPO within a week.  Mother claimed Father initiated contact and harassed her through Instagram.  According to Mother, Father blamed her for his arrest and the military charges against him, and he pressured her to tell the police that nothing happened.  Father claimed Mother contacted him using unlisted numbers up to 30 times a day.

---

[2]     After Stepfather reported Father, Mother accused Stepfather of domestic violence, sexual abuse, and withholding child support money, and unsuccessfully sought a restraining order against Stepfather.  She later claimed that Father had forced her to falsely accuse Stepfather.  Father denied this.

[3]     Father was discharged from the military in January 2025 for possession of steroids and cocaine, and communicating a threat, based on the June 2024 incident.  Mother testified on Father's behalf at his board hearing She did so in part in the hopes of securing benefits for her daughter B.W.  B.W. would lose insurance benefits if Father were discharged from the military.  Mother also testified for Father because Father threatened to kill her if she "messed up the stand" and he also threatened to kill Stepfather.

Contact occurred so often that Father changed Mother's name on his phone so no one at work would see they were in contact. In one communication Mother texted something like, "[T]ell [B.W.] her mother loved her." In response Father went to the house despite the MPO. He found Mother on the porch with a bottle of whiskey, sitting under a noose. B.W. was upstairs. Mother hit Father in the face, and he left. Mother denied this occurred.

Eventually Father admitted to living with Mother from Thursdays through Sundays while the MPO was in effect. Mother admitted to Stepmother that Father never left and continued living with her while the MPO was in effect.

On July 4, 2024, Mother and Father had an altercation at the beach. Mother reported Father "was throwing [her] around the car" during an argument while B.W. was in the back seat. He choked her and covered her mouth and nose with his arm while grabbing her neck. The attack lasted up to two hours. Mother said Father grabbed B.W.'s head with one hand and said he was going to kill B.W. to make Mother scream. Father said Mother had tracked his vehicle to the beach using GPS and began yelling at him. Father denied threatening B.W.

On the day after Thanksgiving in 2024, Mother saw Father emerging from another woman's apartment. He dropped off two car seats in the parking garage of Mother's complex. Mother came running out and jumped on the hood of the car to prevent him from leaving. She demanded the remaining part of the car seat. Father unlocked the car and Mother entered the back seat. Father testified when Mother got into the car she punched him in the face, so he pushed Mother away. Mother told the Agency she was

4

screaming about Father's infidelity and Father punched her multiple times.[4] Father asked her to get out and tried to drive away. Mother reached over and put the car in park. During the incident B.W. was left alone in the apartment. Father told the Agency they were in the parking garage for seven minutes, but later estimated Mother had left B.W. alone in the apartment for 15 minutes. Mother said she left B.W. for five to seven minutes to go down to the garage.

Father got out of his vehicle and went up to the apartment. Mother followed. Mother gave conflicting explanations about what Father did in the apartment. In a declaration, Mother stated Father threatened to take all the food so they would have nothing to eat. He then hit her when she blocked the refrigerator. To the police she said Father threatened to take B.W. from her, and he started gathering up the baby's belongings. She said he struck her when she tried to stop him from leaving.

Mother said that Father threw her around the apartment causing her to hit the paintings on the wall, the baby gate, and the couch. He choked her on the couch to the point she almost passed out, and her memory of events became "fuzzy." She pulled his shirt and grabbed his chain off his neck. She said he wrapped his chain around his hands and pinned her against the wall and strangled her with it. According to Mother, Father said words to the effect of, "I'm going to kill you," and Mother said, "Do it," because she wanted it all to end. Father recalled that Mother said something like "Why don't you kill me[,] what's the point."

Father said he did not choke, punch, or kick Mother. He pushed her away when she punched him in the car and when she tried to prevent him

---

4     At trial Mother denied ever screaming. She introduced a video of the encounter in the garage in which bystanders do not appear to look over at her.

from leaving the apartment.  He testified that she ripped the necklace off his neck and she choked herself.

At the time, B.W. was in her crib sleeping, with the door closed.  After the altercation, Mother said Father went to B.W.'s room and gave the baby a kiss.  B.W. did not wake up.

Father left but said he would return.  According to Mother, he called her and said if he returned before the police did, he would finish her off.  Mother took B.W. and hid in a neighbor's apartment, then in the maintenance room, then in the apartment manager's office until police arrived.

Mother told police officers that there had previously been at least five strangulation incidents.  Law enforcement documented a red line across Mother's neck and minor bruising on her extremities.  Mother was transported to the hospital for evaluation.  The arresting officer later informed the Agency that the strangulation marks on Mother's neck did not appear to match the story told by Mother.

The Agency filed section 300 petitions for all three children, based on abuse or neglect of B.W. on November 29, 2024.

ADDITIONAL INVESTIGATION AND EVIDENCE

In an interview with the Agency, Stepmother said Mother told her Father had been physical with Mother at least five times and had hit Mother at least one time while Ki.B. and Ke.B. were present.  Stepmother informed the Agency that Ki.B. and Ke.B. had come to her home with bruises and scratches in various places.  When she questioned Mother about the marks, Mother explained that Ke.B. had fallen, and the children scratched each other.  Stepmother also said the children had come from Mother's house with bad diaper rashes and raw skin.  At a December 2024 visit, a social worker

6

asked Mother about a bruise on Ke.B.'s tailbone. Mother said it happened when she changed Ke.B.'s diaper on the hardwood floor.

The Agency attempted to interview Ki.B. and Ke.B. in December 2024. When asked what happens at Mother's house, Ki.B. told the social worker, "dada scary, mama sad." Ke.B. was not able to answer when asked to say his name.

At the December 2024 detention hearing, the juvenile court found the Agency met its burden under Welfare and Institutions Code,[5] section 300 and that continuing the children in Mother's care was contrary to their welfare. Ki.B. and Ke.B. were detained with Stepfather. B.W. was detained at Polinsky Children's Center, and the Agency was granted discretion to detain her with a relative.[6] The court granted Mother liberal supervised visitation and issued a temporary restraining order protecting Mother. Mother twice sought extensions of that order, which were granted. A limited restraining order is in effect until April 2026.

---

[5] Undesignated statutory references are to the Welfare and Institutions Code.

[6] B.W. was later detained with maternal grandparents.

7

## THE JURISDICTION AND DISPOSITION HEARING

In addition to statements about their prior altercations, at the April 2025 jurisdiction hearing the juvenile court heard from Mother and Father about their finances and the alleged drug use.

Mother stated Father withheld money from her. Mother said when he got mad about her confronting his mistresses, Father would liquidate their entire joint bank account, including the $1,000 monthly in child support she received from Stepfather. Father yelled at her if she spent too much on groceries and kept her from leaving the apartment. Father denied restricting where Mother could go or with whom she could talk. Father testified he did not restrict Mother's access to money, and did not drain their account, although he did pay marital credit cards and payday loans. Father testified Mother took $17,000 out of the joint account while he was in military custody to pay for her various personal items and expenses, but not marital expenses.

Mother testified she had seen Father do cocaine three times. She observed Father consume cocaine in the home while the children were in the car. Father denied the cocaine found in the home belonged to him. He admitted the steroids in the home belonged to him and that he used steroids. He said the steroids heightened the emotions he was feeling. If he were angry, the steroids would make him a little more angry.

The Agency reported that by the time of the jurisdiction and disposition hearing in April 2025, Mother was employed full-time and had moved to a secure location with security cameras. Mother had a safety plan and was working with her service providers.

The social worker testified at trial that Mother engaged in services early, participated in groups, worked with a parent partner, and was making

good progress.  Mother had some in-person visits with B.W. and had daily video visits with the child.  As allowed by the Agency, Mother began unsupervised visits with Ki.B. and Ke.B.  She had daily video visits with them.  The children were happy to see Mother, and visits went well.

Father requested a paternity test to determine his paternity of B.W. He sought a restraining order against Mother and told the Agency he did not feel comfortable traveling to San Diego until that restraining order was approved.  The social worker believed Father had moved to Tennessee. Father had conducted two video visits with B.W.  He had not engaged in any of the voluntary domestic violence and parenting services recommended to him, and he continued to deny any domestic violence had occurred.

The juvenile court sustained the allegations in the section 300 petitions for all three minors.  The juvenile court found by clear and convincing evidence that removal of the children from Mother was appropriate, and that reasonable efforts had been made to prevent the children's removal.  The court detained Ki.B. and Ke.B. in Stepfather's care and ordered family maintenance services for Stepfather and enhancement services for Mother. The court ordered removal of B.W. from Father.  The court continued B.W. in her placement with maternal grandparents and ordered supervised visitation for Mother and reunification services for Mother and Father.  The court denied Father's request for a restraining order against Mother.

## DISCUSSION

A. *Substantial Evidence Supported the Jurisdictional Finding*

Section 300, subdivision (b) allows the court to take jurisdiction when "there is a substantial risk that the child will suffer . . . serious physical harm or illness" because the parent has failed or is unable to provide adequate supervision or protection.  (*Ibid*.)  Subdivision (j) allows a court to take

9

jurisdiction when a sibling has been abused or neglected and there is a substantial risk the child will be abused or neglected.  Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing.  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396 (*Savannah M.*).

Jurisdictional findings are reviewed for substantial evidence.  (*In re James R.* (2009) 176 Cal.App.4th 129, 134–135; *Savannah M., supra*, 31 Cal.App.4th at p. 1393).

A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue."  (*In re S.O.* (2002) 103 Cal.App.4th 453, 461 (*S.O.*)  Standing alone, past conduct is insufficient to establish a substantial risk of harm and "there must be some reason beyond mere speculation to believe [the past conduct] will reoccur."  (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564–565.)  The court, however, " 'need not wait until a child is seriously abused or injured to assume jurisdiction' " and "[a] parent's past conduct is a good predictor of future behavior."  (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Both Mother and Father contend the trial court impermissibly relied on past misconduct to assume jurisdiction.  We conclude substantial evidence supports the trial court's determination that jurisdiction was warranted.

First, we defer to the trial court's finding that both Mother and Father were not credible.  Despite finding both primary sources of information incredible, the trial court nonetheless concluded there was "ample evidence" of escalating domestic violence between the parents, in the form of "verbal altercations, physical abuse, property destruction, stalking, harassing, [and] coercive control such as monitoring behavior;" that "both parents fed into this

10

dynamic;" and, crucially, that the parents' dynamic placed the children at risk of future harm, abuse or neglect.

1. *Past Violence Posed a Current Risk of Harm on All Children*

Although details of the events are disputed, the record contains substantial evidence from both parents supporting the trial court's conclusions. There was substantial evidence to support the court's finding that past abuse occurred. Mother and Father each described occasions of physical contact: Mother claimed Father strangled and punched her in June, July and November, and Father claimed Mother hit him in August and November. Each accused the other of property damage, stalking, harassing conduct, and coercive control: Father accused Mother of placing a photo of Mother inside his vehicle while he was in custody, calling him dozens of times from unlisted numbers, and checking his phone and calling his recent contacts. Mother accused Father of keeping her from going out, pressuring her to lie, and threatening her and B.W. Each accused the other of misusing joint funds.

There is also substantial evidence to support the court's finding that Mother and Father's dynamic posed a risk of future harm on all three children. In evaluating whether past domestic violence poses a current risk of harm, courts have considered factors such as the severity of the domestic violence (see e.g., *In re S.F.* (2023) 91 Cal.App.5th 696, 715 (*S.F.*)), whether the children were present during the violence (*ibid*), the length of time since the termination of the abusive relationship (see e.g., *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21–23, (*Ma.V.*), and the vulnerability of, and impact on, the children. Analysis of these factors buttresses the juvenile court's finding.

11

To begin with, the encounters involved severe violence. Mother experienced "lethal" choking by Father on multiple occasions. In July, Mother was choked and thrown around the car in the incident at the beach. Father grabbed B.W.'s head and threatened to kill her. In November, Mother said she was choked by Father so severely things grew "fuzzy." She reported she was choked, punched, and kicked repeatedly by Father, and she believed if it escalated any further she would be dead. Indeed, Mother reported that Father expressed an intent to "finish her off" if he returned to the apartment before police arrived. Law enforcement observed a red strangulation mark on Mother after that particular incident, and Mother was transported to the hospital for treatment. These violent encounters support the juvenile court's conclusion that the relationship imposed a risk of future harm to the children. (Cf. *S.F., supra,* 91 Cal.App.5th at 715 [no future harm where three incidents of " 'tussling' " involved some physical touching but no physical injury]; *In re Cole L.* (2021) 70 Cal.App.5th 591, 604–606 (*Cole L.*) [no future harm where "at most" there was "some pushing" and grabbing for father's cell phone].)

Courts have also considered whether minors were present and witnessed the abuse. (See *Cole L., supra,* 70 Cal.App.5th at pp. 605–606 [incident of pushing and shoving occurred outside presence of children]; *S.F., supra,* 91 Cal.App.5th at p. 715 [no evidence any arguments or physical contact between parents ever occurred in the presence of minor]). Here, Mother acknowledged to Stepmother that Ki.B. and Ke.B. witnessed at least one occasion of violence between Mother and Father. B.W. was in the car during the beach encounter in July, which Mother described as a lengthy ordeal during which Father threw Mother around and choked her. According to Father, B.W. was in her crib in her room upstairs when Mother was on the

12

porch with the whiskey and hit Father. In November Mother left B.W. alone to confront Father in the parking garage, and when the noisy and violent altercation resumed in the apartment, B.W. was in her crib in her room. All three minors were thus present for one or more physical encounters between Mother and Father.

The violence between the parents escalated in the six months between June and the end of November, culminating in the attack on November 29, 2024. Despite multiple incidents prior to November, including an allegation that Father threatened B.W.'s life in a phone call and physically grabbed B.W.'s head, Mother did not remove herself or B.W. from the relationship, and there was evidence Father had been living with Mother and B.W. for months. By the time the disposition hearing began on April 1, approximately four months had elapsed since the last incident of domestic violence between the parents, and as the juvenile court noted, while Father had moved away, he was entitled to remain in contact with Mother and B.W. as the presumed father. In other words, this was not a relationship that terminated, even if the marriage was over. (Cf. *Ma.V., supra*, 64 Cal.App.5th at pp. 21–23 [insufficient evidence to support jurisdiction where it had been over 10 months since abuser had left the home, and the mother had ended her relationship with him].)

The vulnerability and impact on the children from the violence between the parents further support the court's finding of jurisdiction. As the Agency explained in its detention report, at this age the children "are unable to voice how the parents' behaviors affect their physical and emotional wellbeing," and they "have no protective capacities of their own and rely solely on their parents for protection." There was nonetheless evidence the children were affected by the violence. Ki.B. answered, "dada scary, mama sad" in

13

describing what happened in Mother's home, suggesting that she had observed threatening conduct or actual violence there.

Mother did not protect her young children from Father's problematic behavior. Ke.B. and Ki.B. were present at least for one occasion when Father hit Mother. They were in the car when Father used cocaine inside the house. In November, Mother did not prevent Father from going into B.W.'s room, although Father had just choked and punched her multiple times and had threatened to take the baby away. This contact occurred despite there being an MPO in place to protect Mother and B.W. (See *S.O., supra*, 103 Cal.App.4th at p. 462 [sufficient evidence for jurisdiction where mother allowed father unsupervised contact with children in spite of a prohibition against such contact]).

Taking the record as a whole, the trial court reasonably concluded that Father was likely to continue to seek retribution against Mother, and Mother was likely to fail or be unable to provide adequate supervision or protect the children. In sum, substantial evidence supports the determination the children were at substantial risk of suffering serious physical harm or abuse. (§ 300, subds. (b), (j).)

B. *Substantial Evidence Supported Dispositional Orders*

The juvenile court may remove a child from a parent's physical custody if there is clear and convincing evidence of "a substantial danger to the [child's] physical health, safety, protection, or physical or emotional well-being" and there is no other reasonable means to protect the child's physical health. (§ 361, subd. (c)(1).) "The . . . minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) There must

14

be clear and convincing evidence that removal is the only way to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

When presented with a challenge to the sufficiency of the evidence where the trial court had to make a finding by clear and convincing evidence, we must determine "whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*)) Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment we must "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 1011.)

For the reasons set forth *supra* discussing the jurisdictional finding, we conclude the Agency demonstrated by clear and convincing evidence the likelihood of substantial danger to all three minors.

As to whether there were means other than removal to protect the children, we note that at the time of the hearing in April, Mother had not been engaged in therapy or group sessions for long, and her routines and insights were new. There was no evidence Father had engaged in any services. There were indications Father had moved to Tennessee, but the record contains no evidence about his employment or residence status, or any indication whether he intended to stay out of state or return to California. The success of any option other than removal would have squarely rested on the reliability of Father to comply with the restraining order, and on the reliability of Mother to keep herself and her children a safe distance from

15

Father and refrain from provoking or being provoked into violations of the restraining order. The juvenile court found both of them not credible, noted that they had failed to stay apart in the past when ordered to do so, and reasonably inferred that the MPO and the Agency's interventions in June 2024 "were insufficient to ensure a course correction in the parents' lives for the protection of the children." (*O.B., supra*, 9 Cal.5th at p. 1011 [reviewing court defers to how trier of fact evaluated the credibility of witnesses and drew reasonable inferences from the evidence].)

The juvenile court's determination that Mother and Father currently "strongly disagree and dislike each other," and there continued to be "retaliation" supports the conclusion that the children would be at risk in Mother's custody. In particular, B.W., the youngest and most vulnerable child, was repeatedly caught in the middle of Mother's and Father's fights. Father grabbed B.W.'s head and threatened to kill her in July to get Mother to scream and allegedly threatened to take B.W. away from Mother in November. For her part, Mother cited to the need to protect B.W. and ensure she continued to receive health care benefits as a reason she lied during Father's board hearings and recanted her allegations of abuse against him.[7] She invoked B.W.—asking Father to "tell [B.W.] her mother loved her"—in communications with Father in violation of the MPO. Fearing Mother was going to kill herself, Father in response went to Mother's house where another confrontation ensued. In other words, each parent used B.W. as a pawn to provoke and control the other.

As to the older siblings, the court identified ongoing issues in Mother's relationship with Stepfather, and there is ample support for that concern,

---

[7] (See *supra*, fn. 3.)

16

given Mother's false accusations of abuse against Stepfather in the past[8] and Stepfather's concern that Mother had not adequately protected their children from Father. In light of the court's skepticism over Mother's and Father's trustworthiness to abide court orders, placing Ki.B. and Ke.B. with Mother risked sending them back into a situation Ki.B. described as "scary."

Examining the record as a whole, we conclude there was substantial evidence to meet the clear and convincing standard to justify removal of the children from Mother.

C. *The Court did not Abuse its Discretion in Ordering Supervised Visitation*

Finally, the juvenile court is accorded broad discretion in visitation matters, and we will not interfere with the exercise of that discretion absent a showing of a clear abuse. (*In re Megan B.* (1991) 235 Cal.App.3d 942, 953.)

Although the Agency recommended unsupervised visits with the older children and Mother had begun to conduct such visits, the juvenile court did not abuse its discretion in ordering supervised visits with all three children. As discussed *supra,* Mother had in the past been drawn into altercations with Father and neglected the children, and her efforts to understand patterns of domestic violence were relatively new. Because there were concerns about the children's well-being in her care and about her trustworthiness to comply with court orders, it was not an abuse of discretion to order supervised visits.

---

[8] (See *supra*, fn. 2.)

## DISPOSITION

The jurisdiction, disposition, and visitation orders are affirmed.


IRION, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.